GRIFFIS, P.J.,
for the Court:
¶ 1. Joseph Ronald Hartfield (“Hart-field”) was convicted of conspiracy to murder his wife, Tabitha Hartfield (“Tabitha”). Hartfield argues that: he was denied his fundamental constitutional right to present a defense by the exclusion of letters writ *1102 ten by a codefendant; he was erroneously denied a peremptory challenge; his trial was rendered unfair by the admission of “bad acts” evidence; the evidence was insufficient to support the conspiracy conviction; and the verdict was not supported by the weight of evidence. We find reversible error and remand for a new trial.
FACTS AND PROCEDURAL HISTORY
¶2. Hartfield, Natasha Graham (“Graham”), and Ethan Dixon (“Dixon”) were charged with the murder of Tabitha and with conspiracy to commit her murder. Dixon pled guilty to the crimes of conspiracy to commit murder and accessory to murder, in exchange for the State’s recommendation of a sentence of twenty-five years. Graham was found guilty of murder and conspiracy to commit murder, and she was sentenced to life imprisonment. The supreme court affirmed her conviction. Graham v. State, 120 So.3d 382, 389 (¶ 30) (Miss.2013).
¶ 3. Graham’s trial was held on March 26-28, 2012. Id. at 384 (¶2). Hartfield’s trial was held June 18-20, 2012. Dixon testified at the trials of both Graham and Hartfield.
¶ 4. On May 31, 2008, the Lamar County Sheriffs Department received a 911 call from a woman who claimed that she had killed her cousin. Officer Jason Alexander was dispatched to respond to the call. Officer Alexander found Graham walking in the vicinity of the-location given. Graham told Officer Alexander that she had killed her cousin, Tabitha, and buried her in the woods. Graham then took Officer Alexander to the location where Tabitha was buried. Officer Alexander then arrested Graham.
¶ 5. Officer Alexander asked Officer Matt Henderson to transport Graham to the jail. Officer Henderson testified that, while in route to the jail, Graham made a statement that “Dixon was there and he helped. And Mr. Hartfield was there, but in the house.... Hartfield was at the house, but not near where the murder occurred.”
¶ 6. Officer Alexander also talked to Chief Investigator Richard Cox. Investigator Cox contacted Investigator David Bullock, informed him that there had been a murder, and requested his assistance in the investigation.
¶ 7. Investigator Cox spoke with Graham at the jail. Graham said that a blue dog leash was used to strangle Tabitha. Investigator Cox obtained Graham’s consent to search her trailer and found two blue nylon dog leashes hanging in the laundry room.
¶ 8. Investigator Bullock was advised that Dixon was also a suspect in the murder investigation. After Dixon was arrested, Investigator Bullock obtained a statement from him, and he recounted the events of the murder. Dixon stated that he had strangled Tabitha with a dog leash, given to him by Graham. Dixon also stated that Ronald never knew that Tabitha had been strangled and buried.
¶ 9. Investigator Bullock interviewed Hartfield on June 2, 2008. Hartfield stated that he was present at the house on the night of May 24, 2008. Hartfield told Investigator Bullock that he and Tabitha had gotten into a fight, so Tabitha tried to drive off in their car; but she wrecked the car. Hartfield checked the car and realized it was stuck, so he went inside and went to sleep. Hartfield denied any involvement in the murder and stated that he first learned of the murder on May 31, 2008.
¶ 10. There is no dispute that, at some point in the night on May 24, 2008, Tabitha, Hartfield, Graham, and Dixon were at Graham’s residence. Tabitha and Hart- *1103 field got into a fight, so Tabitha tried to leave in Hartfield’s car. She drove the car into a pond dam, and the car became stuck. Tabitha got out of the car and walked off. Hartfield and Dixon tried to get the car out of the pond dam but could not.
¶ 11. The facts are, however, disputed about how Tabitha was murdered. Dixon testified that Graham crushed up some pills, mixed them in a glass of water, and brought the glass to Tabitha. Dixon further testified that he and Hartfield tried to get the car out of the dam but could not. Dixon stated that Hartfield went to where Tabitha was lying in the driveway and strangled her with a dog leash. While Hartfield was strangling Tabitha, a car pulled into the driveway. It was later determined that Jeremy Gibson was the driver of the car. After the car left, Hart-field went back out to Tabitha and strangled her a second time with the dog leash. Later, Graham cut Tabitha’s wrists with a kitchen knife. Her body was wrapped in a blanket and placed in a utility trailer. After Hartfield left the next morning, Dixon and Graham buried Tabitha’s body deep in the woods behind Graham’s trailer.
¶ 12. Gibson testified that as he pulled near the driveway, he saw Tabitha lying in the road. Gibson honked and yelled at her to move, and she sat up and looked at him before lying back down. Gibson and Hart-field did not get along. Gibson knew that if Tabitha was present at that address, Hartfield would be there also. So, he left. Gibson changed his mind and drove back to the trailer. When he pulled up, he saw Tabitha still lying in the road. This time she did not move. Gibson also testified that he saw Hartfield through the window sitting at the kitchen table. Graham walked outside to ask Gibson what he wanted, and he told her he wanted pills. Additionally, Gibson testified that he saw Dixon pop his head out of the door. When Gibson left, Tabitha was still lying in the road.
¶ 13. Drew Hartfield (“Drew”), Hart-field and Tabitha’s son, testified that when he was seven years old, Hartfield admitted to him that he had killed Tabitha and would explain why when Drew turned nine or ten years old. Shae’terrica Barnes, Drew’s counselor, testified that Drew heard of how Tabitha died while at school when a student told him that she was choked.
¶ 14. Graham was called to testify. However, because of her prior conviction and her pending appeal, Graham invoked her right to remain silent under the Fifth Amendment of the United States Constitution. She did not testify as to the events surrounding the murder.
¶ 15. At the conclusion of the trial, the jury acquitted Hartfield of Tabitha’s murder and convicted him of conspiracy to commit murder. Hartfield was then sentenced to serve twenty years in the custody of the Mississippi Department of Corrections. It is from this judgment that Hartfield now appeals.
ANALYSIS

I. Whether the trial court erred in excluding Graham’s letters.

¶ 16. Hartfield’s first issue claims the trial court erred in excluding evidence. Hartfield sought to introduce several letters that Graham wrote to her mother, Diane Breakfield, her boyfriend, James Decker, and Hartfield. Hartfield contends that each letter exculpated Hartfield and inculpated Graham and Dixon in Tabitha’s death. Each letter was authenticated. Hartfield contends that the exclusion of these letters constitutes reversible error. We agree.
*1104 ¶ 17. The standard of review for the exclusion of evidence is well settled. The “[ajdmission or suppression of evidence is within the discretion of the trial judge and will not be reversed absent an abuse of that discretion.” Haggerty v. Foster, 838 So.2d 948, 958 (¶ 25) (Miss.2002). Further, “where error involves the admission or exclusion of evidence, this Court will not reverse unless the error adversely affects a substantial right of a party.” Id. (citation and internal quotation marks omitted).
¶ 18. When Hartfield offered the letters into evidence, the prosecution objected on the ground of hearsay. Hartfield’s counsel argued that Mississippi Rule of Evidence 804(b)(3) provided an exception to the hearsay rule that allowed each of the letters to be admitted. Nevertheless, the trial court sustained the objection and excluded the letters.
¶ 19. Mississippi Rule of Evidence 801(c) defines “hearsay” as “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Rule 802 provides that “[hjearsay is not admissible except as provided by law.” Rule 804(b)(3) provides:
The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: ...
(3) Statement Against Interest. A statement which was at the time of its making so far contrary to the declar-ant’s pecuniary or proprietary interest, or so far tended to subject him to ... criminal liability ... that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.
¶ 20. Hartfield asserts that Graham was unavailable and that each letter qualified as a statement against interest under Rule 804(b)(3). Therefore, Hartfield argues that the trial court abused its discretion in the exclusion of this evidence. We quote the letters verbatim.

A. Graham’s Letter to Decker in July 2068

¶ 21. In July 2008, Graham wrote Decker a letter that said:
I’ll tell you what happened that nite— everything — but its really hard on me— so there’s probably going to be a lot more dry tears on this paper than there already is. Tabitha & her husband Ronald came over that day. (She’s my cousin — I loved her — she was a blast!) We were drinking vodka and beer together. She wanted to know if we wanted to ride to Collins with them to go pick up her birthday present. So we did. On the way back to the house she had drank way too much and her and Ronald got into it. She was hitting him and jerking the steering wheel while he was driving and she almost wrecked us a couple of times. I tried to stop her by putting my arms around her from the back seat to pin her down while I was talking to her but she almost bit my thumb into! She turned around and started hitting me & Cody. I dove over the seat at her & crammed her into the floor board. I told her I’d let her up if she promised to behave until they dropped me off. She said ok so I let her up. She did good and when we got to my house she and me talked & hugged. She said she was sorry for showing her ass and all. I told her it was okay that I wasn’t mad at her. Well, she wanted to go home & her husband didn’t so she jumped in their car and started down the driveway with *1105 out him and she wrecked on the pond dam. She jumped out of the car and ran up the driveway a little ways and sat on the side in the bushes. Ronald & Cody tried to get the car out but couldn’t. They went in the house and pulled out a bottle of tequila & started doing shots. By this time b/c of all the drama I was sober. I hadn’t drank nothing since the Fite in the car. I went up the road and was trying to talk Tabby into coming in the house. She wouldn’t. I told her she could stay in the room with me but she still wouldn’t. I tryed talking to her for about 3 hours on and off. I brought her kool-aid and a sandwich thinking if she ate & sobered up some she’d come to her senses and come inside and it didn’t work. So finally I told her if she wanted to be stubborn and sleep in the bushes & get ate up by mosquitoes then I’d let her. I told her I was going to bed and I went inside. It was about 1:00 a.m. and Cody & Ronald was still drinking. I told them I was gonna get a shower and go to bed & that Tabby wouldn’t come in. Ronald said f[* *]k it let her stay out there. I told him they could sleep on the couch and get the car unstuck in the morning. I went to get a shower. When I got out I got in the bed. Cody came in and said he was gonna try to bring Tabby inside & that Ronald was on the couch asleep. I said ok but he’d probably have to carry her in once she passed out cuz she refuses to come in. Well he went outside and I layed down and drifted off. About 30 mins, or a hour later Cody came back in the bedroom & woke me up. He was all excited and crazy looking Bouncing around the room. I was like “whats going on? Whats up w/ you?” Ya know. He started saying “I did it! I did it! I killed her! ” I ran outside and saw Tabby laying face down in the driveway. I ran up to her and couldn’t get her to wake up. I put my head on her back and there wasn’t a heartbeat. I started freaking out! Cody was standing beside me with a kitchen knife in his hand. I was on my knees beside Tabby and I looked up at him and started crying and screaming ‘What did you do Cody? Why? Why did you do this?” He was smiling — his eyes almost glowing out of his head & was telling me how it excited him, it gave him a rush, it turned him on. My dog leash was laying beside her head. I went to get up on my feet and run and he dropped the knife in the dirt and grabbed the leash and caught me around the neck & by my hair. He brought me face to face and looked me in my eyes and told me I wasn’t gonna to tell anybody and he was making sure of it. He said if I didn’t do what he told me to he’d kill me and like it — the same way he did her ... I was so scared Jamie. I’ve never been so scared in my life. I told him I’d do whatever he wanted just don’t hurt my babies. Just don’t take me from my kids and I’ll do anything he said. He took the leash off my neck and I fell down beside Tabby crying so hard I was gagging. I threw up twice in the bushes. He was laughing at me. He told me to help him turn her over so I did. He had a sheet from in the house and we put her on it. He told me to take the knife and cut her wrists so if somebody found her they would think she did it so I did. I helped him wrapp her in the sheet and put her in the wagon behind my lawn mower. He grabbed me and took me inside to the bedroom & told me to get in bed. So I did. I layed there crying with him sitting on the side of the bed wrapping & unwrapping the leash around his hand untill I cryed myself to sleep. About 6:30 he woke me up and told me to come with him. I went outside and me & him *1106 got on the lawn mower. He said I had to go with him cuz he wasn’t leaving me alone & we went into the woods. About a mile & 1/2 back he stopped. He got off the mower and got the shovel. He made me help him get her body out of the wagon and drag her into the woods and lay her down. I sat behind her and cryed & cryed while he dug a hole. He wanted me to help him put her in it & cover it up but I couldn’t. So he did it by his self. Then we went home. Ronald woke up and. left. He used my phone to get somebody to come get him. I called a friend to come get the boys for the week cuz I was scared what would happen. I tryed to do my everyday stuff but I couldn’t and when I went to work at mom’s or in the garden Cody stayed right under me. I couldn’t even talk to mom and she kept asking what was wrong but I couldn’t say nothing cuz Cody was there. I didn’t sleep & when I did I had horrible nightmares. Cody kept the leash in the drawer beside the bed & kept threatening me— cornering me in the house & saying I need to toughen up cuz if anybody found out I’d be beside her in the woods. Finally after about 3 days my other friend Big Cody came over. I asked him would he stay a few days. He knew something was wrong too & kept asking me. Well Cody D. (my Cody — the one that did the sh[*]t) called me in the kitchen and grabbed me & was choking me & Big Cody caught him and got him off of me. Big Cody asked me what I wanted to do and I told him I was seared of Cody D and I wanted him to leave. Big Cody made him get in the car and me and Big Cody dropped him off at his momma’s. That night I told Big Cody what happened. He stayed with me to make sure Cody D didn’t come back and hurt me. My check came in that Friday (it was 5 days after the murder). Me & Big Cody went and paid my bills. I told him I was going to call the law and turn Cody D in. He took me out to dinner & tryed to talk me out of it but it didn’t work. When we got to my house I went for a walk and called 911. I told them I was reporting a murder. When the cops got there I took them in the woods & showed them where he buried her. They arrested my & charged me with murder. It took 2 days (I think) to get Cody D. When they arrested him he wrote a statement saying he did it & that I didn’t ....
(Emphasis added).

B. Graham’s Letter to Hartfield Dated July 31, 2008

¶ 22. Graham wrote a letter to Hart-field, dated July 31, 2008, that said:
Dear Ronald,
I’ve started this letter a thousand times in the last 2 months but my courage always fails me. I cant blame you if you don’t even read this and just throw it away but I have to try.
Cody (Ethan Dixon) has ruined my life so I might as well take this chance to try to make things better for you, your son, and your daughter by letting you know the truth about what happened to Tabby that night. All of it that I know anyway. I don’t know everything but I’ll tell you the parts I do know. If I were in your shoes I think it would help my heart to know. So ....
First off let me say I love Tabby. She was my friend & family. I’d have NEVER hurt her. I hope you already know that. And I think the world of you too. I know ya’ll had problems in your marriage but who doesn’t! And its not fair that her family blames or accuses you for anything. She was at fault along w/ you when it comes to ya’lls problems. And what’s between man & wife is none *1107 of anyone’s business in the first place. Some things are meant to be private. Oh, and I’ve heard the rumors about you & me sleeping together & I don’t care. Let them talk cuz you & I know the truth. I just hope & pray that all of them pay for their lies. And I hope & pray that no matter what happens to me Cody pays for what he’s put all of our kids thru. He took Tabby away from ya’lls 2 and me away from my 3. So that’s 5 kids who’s lives will never be the same.
About what happened — I don’t know all of it but here goes ...
You had fallen asleep on the sofa and me & Cody had laid down. He got back up and said he was gonna try one last time to get Tabby inside cuz he didn’t want her left outside like that. He got up and I halfway drifted to sleep. I’m not sure how long it was before he came back in but he seemed very excited. He said he wanted to show me something so I went outside with him. I got to the end of the pond dam and he pulled her out of the bushes. (God this is so hard Hartfield I am so sorry!) She was limp. I bent down on my knees beside her— Cody was saying how exciting it was to choke her. He still had the dog leash & he had a knife from my kitchen. I was scared and crying. Screaming at him saying what did you do! What did you do! You’re crazy! I checked for a heartbeat, I put my head on her back trying to hear but she wasn’t breathing. I got up and was saying I had to get my phone, I had to get help. He put the leash back around her neck and squeezed making sure he did the job [and] showing off how he did it and how easy it would be to do it to me. I thought there was hope — maybe she was still alive but I was just panicing too bad to really know. I turned around and Cody grabbed me by my hair and neck and swung me back down to the ground. He told me if I told anybody or said anything he’d kill me too. He forced me to look at her face and said that could be me as easy as it was her laying there. I didn’t know what to do. He got a sheet and wrapped her up and made me help carry her. I’m so ashamed but I did what he told me to. Should have tried to fight him, tried to get inside to you but I was confused and scared and I didn’t. And I was scared of you too! I was scared of what you’d do. I went in the woods with him b/c he wouldn’t let me away from him and he buried her. I couldn’t watch. I got sick and threw up. Over the next couple days he threatened me and wouldn’t let me out of his sight — not even to use the bathroom! I couldn’t use the phone— that’s why I didn’t answer or call you back when you left that message. And thats why it took so long for me to call the police. My sister-in-law from Wiggins came that Wednesday and got the boys to safety for me and I started working on getting away from Cody. He was keeping the leash that he choked her with in the drawer beside my bed. He kept saying I’d better act normal or I’d disappear just like her. I was just like a zombie — scared not knowing what was really going on. Finally Cody Cla-burn came over & Cody Dixon put his hands on me & was threatening me in the kitchen. I screamed and Claburn came running in & got him and slapped him down. Me & Claburn took Dixon to his mom’s and dropped him off. Finally I felt safe enough to tell someone. I had some drinks & smoked some weed & worked my nerve up. Then I called the cops. I feel like I killed her b/c I couldn’t do anything to stop it. Since I didn’t wake you up or anything and I listened to Cody (out of fear) I may as *1108 well have done all of it myself. I should’ve done something more — I should’ve risked my life to help her. I cant take that back. I have to live the rest of my life knowing that. I don’t know what all else Cody did to her & I’m not sure I want to know. I’m still not sure I can deal with the things I do know. I cant blame you if you hate me & wish me dead. If I could I’d let you in this cell with me so you could beat me to death or punish me how you see fit— for not doing more & all. I’ll never forgive myself for what has happened. And I don’t expect you to. But I had to tell you — you deserve to know. I don’t know whats going to happen to me but I hope whatever does happen someone will hear my story and use it to save someone else from this same pain.
(Emphasis added).

C. Graham’s Letter to Her Mother, Dated May 17, 2009

¶23. Graham wrote a. letter to her mother, dated May 17, 2009, that said:
It bothers me everyday that I could have kept my mouth shut & still been home w/ my boys but that would’ve made me a horrible person to leave Tabitha’s kids out in the cold always wondering if she left them & stuff. And it wouldn’t have mattered what I said. Cody said to begin with if I told he’d make sure I went down with him. He wasn’t lying & I knew what I was getting myself into from the start. I wish I would’ve told them the truth of how I knew instead of making it worse on myself w/ how I did the 911 call but fear/psychosis makes you do a lot of stupid things & blurs your foresite. I have to deal with that. I’ve accepted my situation ....

D. Graham’s Letter to Her Mother, Dated July 7, 2011

¶ 24. Graham wrote a letter to her mother, dated July 7, 2011, that said:
... The DA still thinks I’m taking up for/covering up for Ronald which I AM NOT. If I knew he did something I’d tell it. So them thinking I’m lying or hiding something is really starting to piss me off. If it wasn’t for me they’d never have a decent case to begin with. I’ve done nothing but be completely forth coming and cooperative & I’m just plain mad now.
(Emphasis added).
¶25. We must analyze these letters under Rule 804(b)(3). There is no question that Graham was unavailable, based on her decision to invoke her Fifth Amendment right not to testify. Each of these letters are “statements” that “at the time of [their] making [were] so far contrary to the declarant’s pecuniary or proprietary interest, or so far tended to subject [her] to ... criminal liability ... that a reasonable [person] in [her] position would not have made the statement unless [she] believed it to be true.” M.R.E. 804(b)(3). Certainly each one of these letters was contrary to Graham’s pecuniary interest and subjected her to criminal liability, such that she would not have made the statement unless she believed it to be true. However, the inquiry does not end there. Rule 804(b)(3) specifically states that “[a] statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.”
¶ 26. In Lacy v. State, 700 So.2d 602, 607 (¶¶ 15-17) (Miss.1997), the Mississippi Supreme Court held:
Corroboration as required by Rule 804(b)(3) is not required to be absolute, and the sufficiency of the corroboration *1109 must be assessed in the light of the importance of the evidence and the of-feror’s fundamental constitutional right to present evidence. In Chambers v. Mississippi, 410 U.S. 284, [302, 93 S.Ct. 1038, 35 L.Ed.2d 297,] ... (1973), the United States Supreme Court declared:
Few rights are more fundamental than that of an accused to present witnesses in his own defense. In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. Although perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed. The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to Chambers’ defense. In theáe circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.
Writers have noted that the requirement that a [statement] against interest be corroborated is not the same as that for corroboration of substantive offenses. Rather, it is only required that the court determine clearly that a reasonable person believe that the statement might have been made in good faith. In Jones v. Hatchett, 504 So.2d 198, 203 (Miss.1987), this Court stated corroboration requires that “there must exist some circumstance in the making of the statement itself which would indicate its reliability. The statement against interest exception to the hearsay rule is based on the recognition that ‘no reasonable person would make such a statement if the statement were not true.’ ” (citing [M.R.E.] 804(b)(3) [cmt.]).
In Davis v. State, 872 S.W.2d 743, [749] (Tex.Crim.App.1994), the Court of Criminal Appeals addressed the issue of corroborating circumstances in determining whether the testimony of the mother of the accused regarding brother of the accused should be admitted. Her testimony was that another son had confessed to the crime. Noting that no definitive test existed to gauge the reliability of the declaration, the Court identified the factors to be considered as including:
Whether the guilt of the declarant is inconsistent with the guilt of the accused, whether the declarant was so situated that he might have committed the crime, the timing of the declaration and its spontaneity, the relationship between the declarant and the party to whom the declaration was made, and the existence of independent corroborating facts.
(Internal citations omitted).
¶27. We must apply the test adopted by the supreme court in Lacy. Graham consistently admitted to assisting in Tabitha’s murder and the disposal of her body. Graham’s admission of guilt in the letters is inconsistent with Hartfield’s alleged guilt. Graham admits cooperation with Dixon and details the steps they took. Graham acknowledged that the conspiracy to kill and bury Tabitha was between herself and Dixon, not Hartfield. In the letter to Hartfield, Graham confesses to assisting Dixon and apologizes for it. In fact, the only evidence of potential guilt against Hartfield is Dixon’s later testimony.
*1110 ¶ 28. Graham was situated to commit the crime. After her arrest, she admitted to being present for the conspiracy, murder, and burial. She admitted to playing an active role throughout. She knew details of the crime that only a person with direct knowledge would have known. On the other hand, Hartfield testified he was asleep on the couch, a fact that both Graham and Dixon confirmed.
¶ 29. Next, Graham admitted in her letters to taking part in the murder. In Dixon’s statement, he killed Tabitha. Both of these statements occurred shortly after the murder and Graham’s and Dixon’s arrests.
¶ 30. Graham provided all of the details of the murder, which were substantiated by Dixon’s statements to the police, her mother, and Decker. Such close relationships as between Graham and her mother, and Graham and Decker, indicate trustworthiness.
¶ 81. Most importantly, there was independent corroboration. First, Dixon admitted that he committed the murder. Dixon’s admission is consistent with Graham’s description of what happened. Next, Graham’s statement of what happened was consistent with Dr. Steven Hayne’s findings in the autopsy. Finally, the details of the crime were consistent in Dixon’s testimony and Graham’s letters.
¶ 32. Here, we are persuaded by the supreme court’s holding in Lacy that the “[c]orroboration as required by Rule 804(b)(3) is not required to be absolute, and the sufficiency of the corroboration must be assessed in the light of the importance of the evidence and the offeror’s fundamental constitutional right to present evidence.” Lacy, 700 So.2d at 607 (¶ 15). Hartfield was entitled to present his case and defense, “and it is fundamentally unfair to deny the jury the opportunity to consider the defendant’s defense where there is testimony to support the theory.” Randall v. State, 806 So.2d 185, 200 (¶ 19) (Miss.2001) (quoting Terry v. State, 718 So.2d 1115, 1121 (¶ 28) (Miss.1998)).
¶ 33. As a result, we find that it was an abuse of discretion for the trial court to exclude the letters Graham wrote based on a lack of corroboration and indicia of trustworthiness. The letters should have been admitted under Mississippi Rule of Evidence 804(b)(3). We reverse Hartfield’s conviction and remand this case for a new trial.

II. Whether the trial court erred in the denial of a 'peremptory strike.

¶ 34. In the second issue, Hartfield argues that the trial court erred in the selection of jurors. During jury selection, the State made a “reverse Batson[1]” challenge and argued that Hartfield had used each of his first six peremptory strikes on white venire members. The court required Hartfield’s counsel to provide race-neutral reasons for each strike. Thereafter, the court determined that Hartfield’s peremptory strike of one juror was discriminatory.
¶ 35. Because we reverse and remand this case for further proceedings, we find that there is no reason for the Court to address this issue.

III. Whether the trial court erred in the admission of bad-acts evidence.

¶ 36. Hartfield also argues that the trial court erred in the admission of certain bad-acts evidence, i.e., testimony about Hartfield’s domestic violence toward Tabitha. He claims that the trial court’s finding that the testimony addressing *1111 Hartfield’s previous domestic violence toward Tabitha was necessary to tell a complete story was erroneous and an abuse of discretion. Hartfield requests a new trial based on this error. Since we have reversed and remanded the case for a new trial, we address this issue to assist in the retrial.
¶ 37. The State filed a pretrial Mississippi Rule of Evidence 404(b) motion that asked the trial court to find incidents of domestic violence between Hartfield and Tabitha admissible. The State argued that evidence of these acts was more probative than prejudicial under Mississippi Rule of Evidence 403. Further, the motion asked the court for permission to introduce evidence of Hartfield’s and Tabitha’s drug use together, along with the arguments and confrontations that occurred on the night of her death. The State argued that it was necessary for the jury to hear the whole story of their past.
¶ 38. The State filed a second Rule 404(b) motion that asked for permission to introduce evidence of domestic violence committed by Hartfield against Tabitha. The State asserted that the evidence was relevant to prove motive, opportunity, intent, preparation, plan, knowledge, absence of mistake, or accident. M.R.E. 404(b). The trial court ruled that the evidence was admissible for the State to tell a complete story.
¶ 39. As stated earlier, the standard of review for a trial court’s decision to admit or exclude evidence is abuse of discretion. Haggerty, 838 So.2d at 958 (¶ 25). Rule 404(b) provides:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
¶ 40. Evidence of prior bad acts is “admissible in order to tell the complete story so as not to confuse the jury.” Jones v. State, 962 So.2d 1263, 1268-69 (¶ 22) (Miss.2007). In Madden v. State, 42 So.3d 566, 572 (¶ 30) (Miss.Ct.App.2010), this Court held “that previous incidents of domestic violence against the victim are admissible to show motive, intent, lack of accident, or mistake.”
¶ 41. The trial court conducted a hearing to determine whether to admit the evidence of domestic violence. In doing so, the trial court found the evidence admissible, not to show character, but rather, for other purposes under Rule 404(b). We find no error in the court’s decision to admit the Rule 404(b) evidence.

IV. Whether evidence was sufficient to support the conspiracy conviction.

V. Whether the verdict was contrary to the weight of the evidence.

¶ 42. Because we reverse and remand this case for further proceedings, we find that there is no reason for the Court to address these issues.
¶ 43. THE JUDGMENT OF THE CIRCUIT COURT OF LAMAR COUNTY IS REVERSED, AND THIS CASE IS REMANDED FOR A NEW TRIAL CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LAMAR COUNTY.
LEE, C.J., BARNES, ISHEE, ROBERTS AND FAIR, JJ„ CONCUR. IRVING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY JAMES, J. MAXWELL, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. CARLTON, J., NOT PARTICIPATING.

. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).